Filed 4/8/14  A.C. v. Superior Court CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| A.C.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>        Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>        Real Party in Interest. | A140959<br><br>(Contra Costa County<br>Super. Ct. No. J13-00016) |

        Mother, A.C., petitions this court for an extraordinary writ pursuant to California Rules of Court, rules 8.452 and 8.456.  She seeks relief from the juvenile court's setting of a hearing pursuant to Welfare and Institutions Code section 366.26[1] to consider terminating her parental rights regarding her infant daughter, J.C.  Mother argues the court improperly set the hearing based on its factually unsupported finding that real party in interest Contra Costa County Children and Family Services Bureau (bureau) provided her with, or offered her, reasonable parenting education and mental health assessment services.  We deny mother's writ because substantial evidence supports the juvenile court's finding.

---

        [1] All statutory references are to the Welfare and Institutions Code unless otherwise stated.

1

# BACKGROUND

## *The Bureau's Petition*

Minor was born two months premature via a caesarean section in November 2012, when mother was brought to the hospital by helicopter after suffering a seizure on a public street. Two months later, the bureau filed a juvenile dependency petition pursuant to section 300. It alleged mother had placed minor at risk of harm due to ongoing domestic violence a week after the birth when mother's boyfriend, minor's alleged father, Joshua O., struck mother in the abdomen, and because mother was non-compliant with her medications for high blood pressure during the pregnancy. Minor was detained and removed from mother's custody.

According to the bureau's January 2013 detention/jurisdiction report, minor was a micro-premature infant diagnosed with respiratory distress, anemia of prematurity, and presumed septicemia, and was still hospitalized. Mother had wanted to take minor home less than three weeks after minor's birth despite being repeatedly told minor was a high risk baby who needed medical intervention for two more months. Mother had very severe high blood pressure, was non-compliant with her medications, reported that she had received only sporadic prenatal care, and possibly had mental health problems. She said she was saddened and disappointed that her medical condition necessitated minor's premature delivery, was unaware of the gravity of her condition because of the absence of symptoms, did not intend to take minor from the hospital before the hospital's recommendation for discharge, and did not have any history of substance abuse or mental illness.

The alleged father, Joshua O., who was present at minor's birth, was reportedly a heroin addict who assaulted mother upon her discharge from the hospital. Mother identified him as the child's biological father. She denied he had engaged in domestic violence towards her or had any substance addiction, but said she was experiencing problems with her "ex-boyfriend," also an apparent reference to Joshua, who, shortly after her discharge from the hospital in November 2012, had forced his way into her apartment and attacked her.

2

Joshua denied assaulting mother. He said he had not lived with her since September 2012. After her hospital discharge, he had a verbal confrontation with her and broke out one of her windows to gain entry into her residence. He was uncertain that he was minor's biological father and wanted a paternity test. He was incarcerated on burglary charges.

The bureau concluded mother could not provide a safe environment for minor because of her alleged "ongoing domestic violence with the alleged father." It also reported mother had "ongoing domestic violence with one or more partners." She was given resources for domestic violence, and other referrals, including for mental health counseling and parenting, a housing list, and job recruitment information, but had not pursued any of these resources. She also missed a team decision-making meeting about minor after arguing with the social worker who notified her of it; she expressed multiple reasons for missing the meeting, which appeared questionable.

According to the bureau, minor was "medically fragile and mother [had] been non-compliant with the hospital's requirement to participate in the necessary training to provide safe and appropriate care for [minor] when she transition[ed] home." The bureau recommended that minor be placed in an out of the home placement.

In March 2013, mother pled no contest to the petition allegation that she had placed minor at risk of harm due to ongoing domestic violence. The court sustained this allegation and dismissed the others. Joshua was ordered to have no contact with mother, individually or through a third party.

### *Disposition*

In its April 2013 disposition report, the bureau cited nine prior referrals regarding mother as a minor from December 1993 through August 2005, which involved caretaker absence or general neglect. Police records indicated she was involved in petty theft and shoplifting in 2006 and 2007. Joshua was incarcerated, having been arrested in December 2012 for multiple felonies and misdemeanors, including possession of a controlled substance while armed, carrying a concealed weapon, carrying a loaded firearm, and second degree robbery.

The bureau summarized a November 15, 2012 police report by a police officer dispatched to mother's residence in Antioch, California. The officer reported finding mother hysterical, crying, and bleeding from behind her left ear. She said she had been in her apartment alone when she heard Joshua at a kitchen window. After she closed it to keep him out, she heard the front window break and Joshua say, " 'I'm going to kill you.' " She ran to the bathroom, locked the door, and called 911. Joshua kicked in the bathroom door, grabbed her cell phone, and kicked and punched her as she lay on the floor trying to protect herself. She thought he was going to kill her based on his actions and previous display of a gun. He left the apartment as he yelled, " 'I'm going to kill you when I get my gun.' " She said she had dated him for eight months and, though they did not live together, he stayed with her sometimes because he was homeless. He had been physically abusive towards her on five other occasions, but she had not called the police.

The bureau reported that mother had obtained a restraining order against Joshua and appeared to be addressing the issues that led to the petition. However, she was seen during a recent court hearing giving Joshua her contact information.

The bureau wrote that it was aware mother had been involved in domestic violence incidents with male relationships. She reported to police in March 2012 that her "boyfriend," otherwise unidentified, had hit her with a closed fist approximately 10 to 15 times and attempted to strangle her as she sat on a bed, and had attacked her 40 to 50 times in the past. She said she had called the police several times before, but the reporting officer found no record of priors for mother or her boyfriend. Mother told the bureau during its investigation that "this boyfriend" had also pushed her out of a moving car in 2008, causing her to sustain abrasions all over her body.

The bureau stated mother had shown a commitment to minor by regularly coming to the hospital to care for her and providing her with breast milk. Minor had been placed in foster care. Since then, mother was attending weekly visits with her at the bureau, and was frustrated by her reduced access. She showed she was a concerned and caring parent in minor's doctor visits. Minor, five months old, was susceptible to asthma and other

breathing issues. She was meeting her developmental milestones, presented as a happy and content child, seemed to recognize mother's voice, and was content in her arms.

The bureau reported mother had obtained a restraining order against Joshua, but it remained concerned about mother's own aggressive behaviors at the bureau, as well as her previous threats to remove minor from the hospital prematurely. Mother appeared to lack the ability to regulate her behavior when she became upset or felt other people were not responding to her in an acceptable manner. Twice she was "argumentative and extremely inappropriate" with the bureau's lobby receptionist, requiring that mother be escorted from the building by public safety officers. On one such occasion, her behavior further escalated and several probation officers were called; asked later what provoked her, she complained that the receptionist had been on the telephone with a friend rather than helping her. The bureau concluded, "There is a level of risk when returning a young child to a parent who has several documented domestic violen[ce] episodes and continues to behav[e] in a concerning manner."

The bureau reported mother had been provided with referrals for domestic violence and parent education, financial assistance for parenting/anger management classes, bus tickets, supervised visits, phone and face-to-face meetings, and assistance understanding the juvenile court system and court proceedings.

The bureau recommended minor remain in court-supervised protective care until mother completed a mental health assessment and gained insight into her aggressive and combative behaviors. It recommended reunification services and supervised visitations for a minimum of one hour two times each month be ordered for mother, and a case plan that required her to successfully complete a domestic violence counseling program, a mental health assessment, and individual counseling by October 24, 2013.

At the April 2013 disposition hearing, the court found that Joshua was not minor's biological father based on DNA test results. Joshua was served with a copy of a restraining order. Mother contested the disposition.

At the subsequent May 2013 contested dispositional hearing, for which no transcript is contained in the record, mother and the social worker who authored the

bureau's April 2013 disposition report, Lori Castillo, testified.  The disposition report and a progress report from a bureau referral, Amador Institute, were admitted into evidence. Amador Institute indicated mother had attended three parenting psycho-educational sessions and missed none.  Her "beliefs and behavior" in several categories relevant to her circumstances were assessed as "adequate."[2]  The court ordered family reunification services for mother and adopted the bureau recommendations that we have discussed above.

### The Bureau's Six-Month Review Report

In its six-month status review report, prepared at the end of October 2013, the bureau indicated minor, now 11 months old, remained in foster care.  She was a very alert and interactive infant who was aware of her surroundings and people.  She had a trusting relationship with her foster father and looked to him for reassurance.  She appeared to be meeting her developmental milestones.  She was a little stiff in her body and her doctor and foster parent had concerns about her gross and fine motor skills, but she was improving.

The bureau, along with repeating information contained in its disposition report, reported that mother at first had refused to authorize it to contact Amador Institute to inquire about her participation in their parenting and domestic violence classes, not doing so until late May 2013.  Mother told Castillo that the parenting class she was attending at Amador Institute addressed issues pertaining to older children, and agreed that it would be beneficial for her to attend an additional parenting class that focused on infants and toddlers.

According to the report, mother had previously told Castillo she had not yet participated in a mental health evaluation because she did not have Medi-Cal.  The

---

[2]  These categories were her demonstrated awareness of using abusive behavior in the past and present, acceptance of responsibility and accountability for abusive behavior, commitment to constructive personal change, appropriate behavior in group sessions, demonstrated empathy for victims' experiences, demonstrated awareness of the effect of violence on children and others, demonstrated constructive change in her beliefs, and development of strategies to prevent the reoccurrence of violent and abusive parenting.

bureau assumed financial responsibility for mother's participation in Amador Institute classes. In July 2013, mother told Castillo she would follow through with scheduling a mental health assessment now that she had a telephone. She reported in August that she had made an appointment for an evaluation at Pathways to Wellness, but she did not attend such an appointment. In September 2013, the bureau provided her with authorization to begin mental health services. In late October, mother reported that she had attended only one evaluation session.

According to the bureau, mother's visits with minor were not going well. Minor cried during a majority of the visits, causing her and mother anxiety. Although mother was told about minor's stranger anxiety, mother became frustrated. At one visit, she asked a social caseworker to take minor and said she was no longer going to visit because minor did not like her and mother could not handle the crying any more. Mother tried to soothe minor, but sometimes contributed to her crying by changing minor's clothes immediately upon visiting. Minor was crying less since visits incorporated her riding in a stroller, but continued to cry when she saw mother and during most visits. Castillo encouraged mother to attend therapy to address her feelings of loss and sadness of having her daughter placed out of her care.

Castillo also had concerns about mother's lack of verified employment, and her honesty about it. Mother asserted that she did hair and make-up for others to make money, but did not provide a place of employment to the bureau.

The bureau stated it had provided or offered services to mother along the lines of what it had previously reported, but mother had not completed the necessary services and requirements to address the issues that contributed to minor's dependency. It cited mother's frustration with minor's crying and stated, "There is substantial risk that [minor] will be harmed if [mother] does not address her mental health and anger behaviors." In its case plan update, the bureau indicated mother had not yet met any of her case plan objectives, including because she had stopped attending the domestic violence classes at Amador Institute.

7

The bureau recommended termination of reunification services and the setting of a section 366.26 hearing because of its concerns about mother's failure to follow through with services to address her violent behaviors and emotional well-being. After noting that mother had reported other family members also exhibited violent and aggressive behaviors, the bureau concluded it was "clear that [mother] is immature in many ways and continues to have unaddressed anger issues. Its seems that [minor] is almost like a toy doll that mother dresses up and takes pictures of during most of the visits. [Mother's] verbal exchanges with her daughter are immature, especially when she tells her daughter not to be mad at mommy. [¶] [Mother] has been provided with services and the financial assistance required for her to complete the mental health evaluation and attend the appropriate education classes to improve her behavior and parenting skills," but was "slow to complete the necessary steps to demonstrate her ability to care for her daughter in a healthy manner."

### *The Six-Month Review Hearing and Termination of Reunification Services*

The six-month review hearing commenced on November 21, 2013. The bureau's report was admitted into evidence and its author, Castillo, testified. She said mother had been provided information about mental health services at the Hume Center, Pathways to Wellness, and Amador Institute. Mother told her in July 2013 that she would follow through with a mental health assessment and said in August 2013 that she had one scheduled at Pathways to Wellness, which Castillo had not verified. In September 2013, the bureau arranged for mother to have an assessment at no cost to her at the Psychotherapy Institute, but she did not appear for an October 2 appointment with the psychologist, Dr. Robinson. She cancelled another scheduled for October 15, saying she had a visit with minor, but, according to Castillo, the visit was not until three hours after the appointment. Dr. Robinson met with mother once in late September and twice in the days just before the November review hearing. He was not able to complete a report, but did complete a personality assessment tool that gave limited information.

As for other services and classes, the bureau had agreed to pay for mother's parenting, therapy, and domestic violence services at Amador Institute. Castillo only had

8

verification that mother had attended three sessions there. In July 2013, mother told Castillo she was no longer attending Amador Institute's domestic violence, anger management, or parenting classes.

Castillo testified that it was "very important" for mother "to have awareness of infant care." Mother told her during a visit with minor in approximately July 2013, that the parenting class she was taking at Amador Institute, with her sister, was geared towards older children. Mother's sister, who provided good support and modeling to mother in visits with minor, stated she knew of a class that was more appropriate. Castillo did not provide mother with a referral because she understood mother would follow through on her sister's suggestion.

Castillo testified about mother's visits with minor consistent with the bureau's report. To deal with minor's stranger anxiety, mother's visits had been increased to weekly and lengthened. Mother had a few good visits in October 2013, when she remained calm and minor stopped crying. However, overall, it was difficult for Castillo to say the quality of the visits had improved.

The hearing was continued in the middle of Castillo's testimony, and the court ordered mother be allowed weekly visitations. When the hearing recommenced on January 30, 2014, Castillo further testified that Dr. Robinson told her he had not completed the mental health assessment, and that mother's attendance record was poor. He had met with mother five times overall since September 2013, including three times between December 24 and January 22. Mother had not attended or cancelled three October appointments and cancelled three in December. Also, Castillo said, mother had missed a mid-December appointment with Dr. Robinson, but later told Castillo she had had an appointment with him at that time.

Since the last hearing, Castillo said, mother had visited minor approximately once a week and had acted appropriately. She was improving in recognizing minor's cues, but needed prompting from Castillo to avoid agitating minor at times. Recently mother explained her late arrival for a visit by saying the bus was running late, but was later overheard to say she had slept late. Castillo did not recommend unsupervised visits

9

because mother had not demonstrated any progress on her case plan and Castillo was concerned about her behaviors.

A December 2013 Amador Institute progress report was also admitted into evidence. It indicated mother had attended 13 sessions, but missed 12, all unexcused. She was not in compliance with the conditions of the program contract, not benefitting from the program, at risk of being terminated, and assessed as poor in all but one of the relevant categories of her beliefs and behavior (the other being an "adequate" assessment), including regarding her development of strategies to prevent the reoccurrence of violent and abusive parenting. She was dropped from the parenting program in October 2013 for excessive unexcused absences.

There was also evidence presented that mother's characterization of the Amador Institute parenting class was inaccurate. As the court noted during the hearing, the December 2013 Amador Institute progress report contained a comments section. This states in relevant part, "The parenting curriculum covers all aspects of appropriate parenting techniques. *Infant care is covered during lessons five and 12*." (Italics added.) According to the report and Castillo's testimony, mother missed class 5, held in May 2012, and class 12, held in June 2012.

Castillo said mother had obtained an emergency restraining order early in the case against Joshua, but had not followed through on it. She had repeatedly been given information or referred to STAND, a domestic violence program. Although she had reported to Antioch police that Joshua had attacked her, she later recanted her story, saying that she had lied.

Mother also testified. She said she had a restraining order against Joshua, but left it at home.[3] She had no contact with him. She attended one domestic violence class at Amador Institute and stopped, which was a mistake. She had recently reenrolled, but missed the class to attend the hearing.

---

[3] After mother testified, the court determined from its records that a restraining order regarding Joshua was in effect until May 2018.

10

Mother did not recall being given a referral for a mental health assessment, including to Pathways to Wellness, and had left all her papers at home. She had received some mental health services at Pathways, but had not completed them because she was going to parenting and domestic violence classes at the time and, given her lack of a car, found it more convenient to see Dr. Robinson. She said she went to Dr. Robinson "every week" for sessions that were "more like therapy," and Dr. Robinson had not talked to her about completing a mental health assessment. She had asked him a week or two ago about it, but "he didn't really say anything about it," and only scheduled her for appointments every other week.

Since early January, mother said, she had attended three sessions of a 12-week infant parenting class at the First Five Center, which was near Dr. Robinson's office. She had attempted the day before to obtain documentation of her attendance, but her teacher said she was too busy to prepare it before the hearing.

Mother said she changed minor's clothes when she visited because minor's diaper was extremely wet. She and minor played kitchen and had "mommy and baby time." In the beginning, minor cried a lot. During one visit mother became irritated and hurt by minor's crying, and was ready to go home towards the end of the visit. Now, she was able to control minor, who laughed during their visits when mother tickled and played with her.

Counsel for the bureau and the minor argued that the juvenile court should follow the bureau's recommendations by terminating services and scheduling a section 366.26 hearing because the minor remained at risk in light of mother's failure to progress on her case plan. Counsel for mother argued the court should not because mother had made a lot of progress and should be given more time.

The court then ruled. It referred to the evidence that mother had been the victim of domestic violence on dozens of occasions, but nonetheless had recanted her story of Joshua's assault of her and "done absolutely nothing to address the history of domestic violence other than this restraining order." Her participation in the services offered to her was "non existent or extremely poor," and the numerous "poor" assessments in the

Amador Institute's latest progress report were "really troubling." The court was also concerned about mother's irritability in her visits with minor and with bureau staff. The court concluded that mother posed "a significant risk of danger and harm" to minor and nothing in the record indicated there was a substantial probability minor would be returned to her by the end of the 12-month period, which, by the January 30, 2014 hearing, was less than two months away, on March 9, 2014.

Accordingly, the court adopted the bureau's recommendations. It found by clear and convincing evidence that the bureau had provided or offered reasonable services to mother that were designed to aid her with overcoming the problems that had led to the initial removal and continued custody of minor, Castillo had worked very diligently to try to engage mother in these services, and minor's return to the custody of her mother would create a substantial risk of detriment to minor's safety, protection, and physical or emotional well-being. It terminated mother's services and scheduled a section 366.26 hearing.

Mother subsequently filed this petition for an extraordinary writ. She also requested a temporary stay of the section 366.26 hearing, scheduled for April 30, 2014, pending the outcome of this writ. We issued an order to respondent superior court to show cause why the petition should not be granted and denied mother's request for a temporary stay. Subsequently, the bureau filed a response, which we have deemed a return to our order.

## DISCUSSION

Mother argues the juvenile court improperly scheduled a section 366.26 hearing based on the factually unsupported finding that the bureau provided her with, or offered her, reasonable parenting education and mental health assessment services. We conclude substantial evidence supports the court's finding.

Under the present circumstances, the juvenile court could not schedule a section 366.26 hearing unless it made a determination by clear and convincing evidence that "reasonable services" have been provided or offered to mother. (§ 366.21, subd. (e); Cal. Rules of Court, rule 5.708(m).) To be clear and convincing, " 'evidence must be so clear

12

as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind.' " (*In re Monica C.* (1995) 31 Cal.App.4th 296, 306.) However, "[t]he standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) We review the record to determine whether substantial evidence supports the juvenile court's ruling. (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762.) Therefore, we review the facts most favorably to the judgment, drawing all reasonable inferences and resolving all conflicts in favor of the order. (*In re Misako R.*, at p. 545.)

Mother, relying on Castillo's testimony, first contends the bureau did not provide her with, or offer her, sufficient parenting education services because it only referred her to Amador Institute for classes geared towards older children, not infants, and did not provide a further referral after mother told Castillo about the inappropriateness of these classes. However, the record contains substantial evidence that the parenting class was appropriate and that mother's own inattention, not the bureau's, resulted in her failure to timely complete the parenting education portion of her case plan. The bureau referred mother to Amador Institute for parenting and domestic violence services. While Castillo appears to have believed mother's July 2013 report to her that the Amador Institute parenting class was geared towards older children, this was Castillo's only error. As indicated by the December 2013 Amador Institute progress report admitted into evidence at mother's six-month review hearing, two of the first 12 parenting classes were specifically devoted to infant care. Yet, mother failed to attend either of them before complaining to Castillo. At best, mother was incorrect about the nature of the parenting class because of her negligent attendance. There was substantial evidence that the class was not inappropriate.

Further, mother provides no reason why Castillo should not have relied on mother's apparent willingness to pursue another parenting class suggested by mother's sister in July 2013, rather than provide her with another referral. It is reasonable to conclude that to do so was unnecessary in light of the sister's recommendation, and

13

ultimately futile in light of mother's failure to follow up on this recommendation until six months later in January 2014, and even then only after the November 2013 review hearing had been continued. Mother offers no explanation why she waited until January 2014 to follow through on this recommendation. It appears that mother's negligence alone resulted in her failure to timely pursue these classes as well.

Finally, Castillo testified that she worked with mother during her visits with minor at the bureau to help her learn how to appropriately parent minor. In short, substantial evidence supports the conclusion that the bureau provided mother with, or offered her, reasonable parenting education services.

Mother also contends the bureau did not provide her with services that would have enabled her to timely complete the mental health assessment portion of her case plan. She casts aspersions on Dr. Robinson because he did not complete such an assessment despite conducting a number of sessions with her. She further contends, based on her own testimony, that Dr. Robinson was conducting weekly therapy sessions with her rather than conducting a mental health assessment, and that the bureau was responsible because it did not tell Dr. Robinson about the nature of services he was to provide.

Mother's contentions in effect ask that we reweigh the evidence, which we do not do under a substantial evidence standard of review. (*In re Spencer W.* (1996) 48 Cal.App.4th 1647, 1650.) Castillo's testimony and the bureau's reports provide substantial evidence that the bureau provided reasonable mental health assessment services. They indicate that the bureau provided mother with at least one referral for a mental health assessment months before mother's first session with Dr. Robinson, but that mother did not follow through. It can be reasonably inferred from the evidence that mother delayed seeking such an assessment for some months despite assuring Castillo that she was doing so. The evidence also indicates the bureau provided services enabling Dr. Robinson to conduct an assessment of mother at no cost to her. However, mother cancelled or did not attend numerous sessions with him from October through December 2013, including sessions scheduled after the court continued the six-month review hearing, when mother should have keenly understood the importance of these sessions.

The juvenile court could reasonably infer from this evidence that it was mother's delays, repeated cancellations, and absences that prevented her from completing the requisite mental health assessment, and that the bureau provided reasonable services that otherwise would have enabled her to do so. Mother's argument again lacks merit.

**DISPOSITION**

Mother's petition is denied on the merits. Our decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).) Mother's request for a stay of the April 30, 2014 section 366.26 hearing is, therefore, moot.

_____
Brick, J.*

We concur:

_____
Kline, P.J.

_____
Richman, J.

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15